JOSEPH E. FORSYTHE, JR.           )
                                  )
     Plaintiff,                   )
                                  )
     vs.                          )     Civil Action No. 07-266
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social Security,  )
                                  )
     Defendant.                   )

## MEMORANDUM OPINION

## I.   INTRODUCTION

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Joseph E. Forsythe, Jr., and Defendant Michael J. Astrue, Commissioner of Social Security.  Plaintiff seeks review of final decisions by the Commissioner denying his claims for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.*  For the reasons discussed below, Defendant's motion is denied and Plaintiff's motion is granted insofar as he seeks remand for further consideration by the Commissioner.

## II.  BACKGROUND

### A.   Factual Background

Plaintiff Joseph E. Forsythe, Jr., was born on February 13, 1961, and received a GED in approximately 1980, having dropped

out of school at the end of ninth grade. (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 7, "Tr.," at 571.) In November 1995, Mr. Forsythe was involved in a vehicle accident in which he broke his left clavicle, right scapula, and left ribs. (Tr. 310.) After a period of recovery, he returned to work as a carpet installer despite complaints of continued pain. (Tr. 310; 89.)

In September 2001, Plaintiff began experiencing increased pain in his left shoulder which was aggravated by activity and pains in his neck, particularly when he rotated his head to the right. (Tr. 177.) Throughout 2002, Mr. Forsythe was treated at Fairfield Medical Associates for pain starting in his shoulder and radiating up into his neck. By October 2002, he was experiencing numbness in both hands and in his right arm. (Tr. 195-198.) During 2002, Plaintiff was also treated at the emergency room of Lee Regional Hospital in Johnstown, Pennsylvania, for chronic pain and headaches. An x-ray of his cervical spine on October 28, 2002 showed no degenerative changes, but did identify mild chronic degenerative disc disease in his lumbosacral spine. A CT scan of his head the same day was essentially normal. (Tr. 187-188.)

Injections of non-steroidal anti-inflammatory drugs were not successful in relieving the pain; in fact, he "failed every imaginable type of reasonable therapy" for relief of his shoulder pain. (Tr. 214, 212.) Plaintiff was ultimately diagnosed with

2

impingement syndrome, subacromial bursitis and partial thickness rotator cuff tear and underwent surgery on his shoulder on February 20, 2003. (Tr. 210-214.) Following surgery by Dr. Edward Hill, his condition initially improved, but two weeks later, he tried to lift a piece of lumber and increased the pain. His surgeon authorized six weeks of physical therapy (Tr. 231) at Crichton Rehabilitation Center, which Mr. Forsythe only partially completed. (Tr. 217-219.)

Plaintiff stopped working steadily in February 2002; he attempted to return to work on an assembly line in August 2002, but was unable to continue due to the pain in his shoulder, neck and head. (Tr. 74-75.) Other attempts at part time work in the summer of 2003 were equally unsuccessful. (Tr. 296, 259.)

B.    Procedural Background

On March 3, 2003, and October 30, 2003, Mr. Forsythe applied for disability and supplemental security income benefits respectively, claiming disability beginning August 15, 2002. Both applications were denied at the initial review stage and Plaintiff apparently did not pursue them further. Mr. Forsythe again applied for DIB and SSI benefits on July 15, 2004, this time claiming he was disabled as of August 15, 2002, due to shoulder pain, neck pain, and associated headaches. (Tr. 70-22 and 509-511, respectively.) When these applications were denied (Tr. 69-73; 513-516), Plaintiff timely requested a hearing before an

3

Administrative Law Judge ("ALJ.")

On November 28, 2005, a hearing was held before the Honorable Raymond J. Zadzilko at which Plaintiff was represented by counsel. Leslie Forsythe testified in support of her husband and Morris M. Morton, Ed.D., a vocational expert, attended the hearing, but did not testify. Judge Zadzilko issued his decision on June 12, 2006, again denying DIB and SSI benefits. (Tr. 15-21.) The Social Security Appeals Council declined to review the ALJ's decision on August 17, 2007, finding no reason pursuant to its rules to do so. (Tr. 6-8.) Therefore, the June 12, 2006 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on October 15, 2007, seeking judicial review of the ALJ's decision.

C.    Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining

4

whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004

5

U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* <u>Simmonds</u>
<u>v. Heckler</u>, 807 F.2d 54, 58 (3rd Cir. 1986), and <u>Sykes v. Apfel</u>,
228 F.3d 259, 262 (3rd Cir. 2000).

## IV.  **LEGAL ANALYSIS**

### A.  <u>The ALJ's Determination</u>

In determining whether a claimant is eligible for
supplemental security income, the burden is on the claimant to show
that he has a medically determinable physical or mental impairment
(or combination of such impairments) which is so severe he is
unable to pursue substantial gainful employment[1] currently existing
in the national economy.[2]  The impairment must be one which is
expected to result in death or to have lasted or be expected to
last not less than twelve months.  42 U.S.C. § 1382c(a)(3)(C)(i);
<u>Morales v. Apfel</u>, 225 F.3d 310, 315-316 (3d Cir. 2000).  To be
granted a period of disability and receive disability insurance
benefits, a claimant must also show that he contributed to the
insurance program, is under retirement age, and became disabled
prior to the date on which he was last insured.  42 U.S.C.
§ 423(a); 20 C.F.R. § 404.131(a).  The Commissioner does not

---

[1]  According to 20 C.F.R. § 416.972, substantial employment is
defined as "work activity that involves doing significant physical or
mental activities."  "Gainful work activity" is the kind of work
activity usually done for pay or profit.

[2] The claimant seeking supplemental security income benefits must
also show that his income and financial resources are below a certain
level.  42 U.S.C. § 1382(a).

6

dispute that Mr. Forsythe satisfied the first two non-medical requirements, and the parties agree that Plaintiff's date last insured will be December 31, 2008.

To determine a claimant's rights to either SSI or DIB,[3] the ALJ conducts a formal five-step evaluation:

(1)  if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2)  if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3)  if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4)  if the claimant retains sufficient residual functional capacity ("RFC") to perform his past relevant work, he is not disabled; and

(5)  if, taking into account his RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 416.920(a)(4); see also Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of

---

[3]  The same test is used to determine disability for purposes of receiving either type of Social Security benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both programs.

performing work which is available in the national economy.[4]
Sykes, 228 F.3d at 263.

Following the prescribed analysis, Judge Zadzilko first concluded that although Mr. Forsythe showed earnings of more than $6,000 in 2003, this could not be considered substantial gainful activity inasmuch as the average monthly earnings for the year were approximately $500 per month; step one was therefore decided in Plaintiff's favor. (Tr. 17, 21.) Resolving step two in Plaintiff's favor as well, the ALJ found that his only severe[5] impairment was degenerative disc disease of the lumbar spine. Although the medical evidence showed treatment for neck, shoulder and headache pain, the ALJ concluded that these conditions had no more than a *de minimus* effect on Plaintiff's ability to perform basic work activities. Similarly, a consultative psychiatric evaluation in February 2006 showed that Mr. Forsythe's reported anxiety did not have a major effect on his ability to work.

---

[4] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n2, *citing* Bowen v. Yuckert, 482 U.S. 137, 146-147 n.5 (1987).

[5] *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that an impairment is severe only if it significantly limits the claimant's "physical ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," as compared to "a slight abnormality" which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience. Yuckert, 482 U.S. at 149-151. The claimant has the burden of showing that the impairment is severe. Id. at 146, n.5.

8

Therefore, the ALJ concluded that Plaintiff's head, shoulder and neck pain, and anxiety were non-severe impairments. (Tr. 17-18.) At step three, the ALJ concluded Plaintiff's degenerative disc disease did not satisfy the criteria of Listing 1.04, disorders of the spine.[6]

At step four, the ALJ concluded Mr. Forsythe had the residual functional capacity to perform the full range of work at the light exertional level.[7] (Tr. 18, 21.) Judge Zadzilko also found Mr. Forsythe could not perform his past relevant work as a carpet installer and a renovator, "which were described as medium, semi-skilled work activity." (Tr. 20.)[8]

---

[6] Plaintiff raises no arguments based on this finding and the Court will discuss his degenerative disc disease only in passing.

[7] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b) and 416.967(b). A person who is able to do light work is also assumed to be able to do sedentary work unless there are limiting factors such as loss of fine dexterity or the inability to sit for long periods of time. Id.

[8] The ALJ did not explain where these descriptions were found and the Court has been unable to identify any support for this finding in the record. According to the *Dictionary of Occupational Titles* ("DOT"), the job of carpet layer, 864.381-010, is a heavy occupation with the specific vocational preparation level of 7, indicating skilled work; a carpet layer's helper, 864.687-010, is heavy and semi-skilled. The occupation "renovator" does not appear *per se* in the *DOT*. "The Social Security Administration has taken administrative notice of the reliability of the job information contained in the [DOT] . . . and often relies upon it at steps four and five of the evaluation process." Burns, 312 F.3d at 126, *citing* 20 C.F.R.

9

Based on Plaintiff's status as a younger individual[9] with a high school education, the ability to communicate in English, his work experience, and his ability to perform the full range of light work, the ALJ determined Plaintiff's vocational profile and, applying the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, concluded Mr. Forsythe was not disabled and therefore not entitled to benefits. (Tr. 20-21.)

B.    Plaintiff's Arguments

In his brief in support of the motion for summary judgment (Docket No. 10, "Plf.'s Brief"), Mr. Forsythe raises five arguments:

1.    The ALJ erred at step two of his analysis by concluding that Plaintiff's occipital neuralgia, myofascial pain syndrome, tremors, and fibromyalgia were not severe impairments (Plf.'s Brief at 7-13);

2.    The ALJ erred as a matter of law by rejecting uncontradicted evidence that Plaintiff's headaches were severe and discontinuing his analysis at step two (id. at 14-18);

3.    As a consequence of the first two errors, the ALJ failed to consider the non-exertional limitations imposed by Plaintiff's headaches and his bilateral use of crutches and compounded this error by applying the "grids" (id. at 19-22);

4.    The ALJ erred by failing to evaluate Plaintiff's hand tremors and ataxia under the appropriate Medical Listing, 11.07(A) (id. at 23-25); and

416.966(d).

⁹ Plaintiff was 41 years old on his alleged disability onset date, making him a "younger" person according to Social Security regulations. 20 C.F.R. §§ 404.1563(c) and 416.963(c).

10

5.  The ALJ erred by failing to consider Plaintiff's fibromyalgia and by condensing 316 pages of medical evidence into seven sentences, leaving this Court unable to determine if relevant medical evidence was rejected or simply ignored (id. at 26-27.)

Although we tend to agree with many of Plaintiff's arguments, we do not address them in detail because, having thoroughly reviewed the medical evidence vis-a-vis the ALJ's analysis, we conclude that much of his opinion is "beyond meaningful judicial review" as that standard has been applied by the United States Court of Appeals for the Third Circuit.

C.  Portions of the ALJ's Opinion Which
    Are Beyond Meaningful Judicial Review

The Third Circuit Court of Appeals first used the phrase "beyond meaningful judicial review" in the Social Security review context in Burnett v. Commissioner of SSA, 220 F.3d 112 (3d Cir. 2000). There, the plaintiff argued that the ALJ had erred (1) by making a conclusory statement that her impairments did not meet any specific listed impairment without explaining his reasoning; (2) by failing to identify the substantial evidence on which he relied in finding her knee and back impairments did not meet the relevant listings; and (3) by not considering the combined effects of her impairments in determining if they were equivalent to a listed impairment. Id. at 119. Noting first that it was well-established in this Circuit that an ALJ must set forth the reasons for his decisions at each step of the analysis, the Court of Appeals cited with approval a case from the Tenth Circuit Court of Appeals in

11

which that Court had set aside an ALJ's determination which consisted only of summary conclusions and did not identify the relevant impairments, discuss the evidence, or explain the underlying reasoning. Id., *citing* Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996). The Third Circuit adopted the holding and language of Clifton, finding that such bare conclusions by the ALJ were "beyond meaningful judicial review." Id. The Court therefore remanded "the ALJ's hopelessly inadequate step three ruling" regarding Burnett for full development of the record, discussion of the evidence, and an explanation of his reasoning. Id. at 120.

In a subsequent case, the Court of Appeals clarified that while Burnett "does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis," he must sufficiently develop the record and explain his findings in order to allow the district court on appeal to conduct a meaningful review. Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004). Where, for instance, the ALJ provides a "sufficiently thorough review of the medical records and of [the claimant's] condition," specifically identifies each of the claimant's severe impairments and discusses the medical evidence, the claimant's testimony and his credibility, it is not reversible error if the ALJ fails to identify or analyze the most relevant listings. This is because the reviewing court is able to discern the ALJ's reasoning based on his discussion of the evidence. *See* Ochs v. Comm'r of Soc. Sec.,

12

No. 05-4421, 2006 U.S. App. LEXIS 16376, *7-*9 (3d Cir. June 29, 2006). This discussion must include "not only an expression of the evidence [the ALJ] considered which supports the result, but also some indication of the evidence which was rejected," otherwise the reviewing court cannot determine "if significant probative evidence was not credited or simply ignored." Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981).

1. *Step two of the analysis – identification and consideration of Plaintiff's physical impairments:* In reviewing the ALJ's analysis of Mr. Forsythe's impairments, we are unable to conclude that he satisfied the Burnett standard at any stage of his review. At step two, for instance, he noted:

> The medical evidence reflects treatment for [degenerative disc disease of the lumbar spine] which causes more than a minimal effect on the claimant's ability to perform work-related activities. Accordingly, it is severe.
>
> The medical evidence establishes treatment for neck, shoulder and headache pain, for which there was MRI evidence on January 14, 2003, of mild supraspinatus and suprascapularis tendonosis and subacromial bursitis. However, he underwent arthroscopic acromioplasty [rotator cuff repair] on February 20, 2003, and following occupational therapy, there were no complaints of pain or discomfort and he tolerated increased therapy activities. Additionally, MRIs and x-ray of the cervical spine were unremarkable, as well as brain MRIs, there was full range of cervical motion, EMG studies were normal and there were no neurological deficits noted on examination. Further, there were no findings when treated in the emergency room, there were instances when the claimant was engaged in heavy work, i.e., moving furniture, and he was independent in home exercise programs following discharge from physical therapy (Exhibits 2F to 7F, 9F through 11F, 13F through 15F, 17F through 21F).

13

. . . . As these conditions do not have more than a *de minimus* effect on his ability to perform basic work duties, the undersigned concludes they are "non-severe."

(Tr. 18.)[10]

On November 14, 2003, Dr. Yi Yan Hong, a pain specialist with Associated Anesthesiologists Pain Management Clinic, diagnosed Plaintiff with right occipital neuralgia,[11] resting tremor in his right arm, chronic neck and lower extremity pain, and myofascial pain syndrome.[12] (Tr. 310-311, 316.) These diagnoses were

---

[10] The Court has omitted the ALJ's consideration at step two of a consultative psychiatric evaluation performed on February 13, 2006 (Tr. 479-483), inasmuch as Plaintiff does not raise any arguments concerning anxiety, depression, or other mental impairments.

[11] Occipital neuralgia is a distinct type of headache characterized by piercing, throbbing, or electric-shock-like chronic pain in the upper neck, back of the head, and behind the ears, usually on one side of the head, i.e., the areas supplied by the two occipital nerves which run from the point where the spinal column meets the neck up the back of the head. The pain is caused by irritation or injury to the nerves, which may result from trauma to the back of the head, pinched or compressed nerves, tumors or other types of lesions in the neck, localized inflammation or infection, gout, diabetes, vasculitis, or frequent lengthy periods of keeping the head in a downward and forward position. In many cases, however, no cause can be found. Relief from pain after an anesthetic nerve block will confirm the diagnosis. Other treatments include massage, rest, injections of steroids into the affected area, and anti-depressants when pain is particularly severe. *See* www.ninds.nih.gov/disorders/ [con't] occipitalneuralgia/occipitalneuralgia.htma website maintained by the National Institute of Neurological Disorders and Stroke (last visited September 5, 2008.)

[12] Myofascial pain syndrome is a chronic form of muscle pain which, unlike normal muscle pain, does not resolve in a few days. The pain is centered around sensitive muscle points called trigger points which are painful when touched; locations of the trigger points include the jaw, neck, low back, pelvis, and the extremities. Treatment options may include physical therapy, trigger point injections or medications such as non-steroidal anti-inflammatory drugs. *See* description at www.mayoclinic.com/health/ [con't] myofascial-pain-syndrome/DS01042 (last visited September 5, 2008.)

14

consistent with the records of Dr. Brian Ernstoff from the John P. Murtha Neuroscience Institute as early as May 12, 2003, in which he referred to myofascial pain with numerous trigger points. (*See*, e.g., Tr. 357-358; 261; 255.) Dr. Colleen Murphy began treating Plaintiff in June 2003, and diagnosed him with possible fibromyalgia in July 2004 (Tr. 324-325), which she confirmed in October 2004, having identified 14 of 18 possible trigger points and other qualifying symptoms.[13] (Tr. 365.) In April 2005, Dr. Murphy also concurred with the diagnosis of benign familial tremor[14]

---

[13]  Fibromyalgia is a condition characterized by body-wide pain and tender points in joints, muscles, tendons, and other soft tissues; its cause is unknown. The overwhelming characteristic of fibromyalgia is long-standing pain associated with 18 defined "tender points" on the back of the neck, shoulders, chest, ribcage, lower back, buttocks, thighs, knees, and elbows. Other specific symptoms include fatigue; sleep disturbances; body aches; reduced exercise tolerance; chronic facial muscle pain or aching; depression and anxiety. Diagnosis of fibromyalgia requires a history of at least three months of widespread pain, as well as pain and tenderness in at least 11 of the 18 tender-point sites. Laboratory and x-ray tests may be done to confirm the diagnosis, primarily by ruling other conditions with similar symptoms. Treatment may include medications to decrease depression, relax muscles, improve sleep quality and reduce inflammation; physical therapy; psychological and life-style counseling; diet modification; stretching exercises and massage; and, in severe cases, pain management programs. *See* the on-line medical encyclopedia maintained by the National Institute of Medicine at www.nlm.nih.gov/medlineplus (last visited September 5, 2008), "Medline Plus."

[14]  Benign familial tremor is a type of "essential tremor," a nerve disorder in which tremors occur in a person who is moving or trying to move. Although the cause of essential tremor is unknown, new research shows that the cerebellum, the part of the brain which coordinates muscle movements, does not appear to work correctly in patients with this disorder. Essential tremor involves a rhythmic, moderately rapid tremor of voluntary muscles. Purposeful movements may make the tremors worse, while avoiding hand movements may make the tremors go away completely. People with essential tremors may have trouble holding or using small objects such as silverware or a pen. If an essential tremor occurs in more than one member of a family, it is called a familial tremor. It appears that genes may play a role

15

in Plaintiff's extremities which had first been noted by Dr. Hong in November 2003 and by Dr. Ernstoff in December 2004. (*See*, respectively, Tr. 444-445; 310-311; and 461-462.) In September 2005, Dr. Kussay Nassr, Dr. Hong's colleague at the pain clinic, noted Mr. Forsythe was having difficulty walking and, based in part on a positive Romberg sign, diagnosed him with "moderate ataxia[15] in addition to mild proximal weakness." (Tr. 459.) Dr. Murphy, who had first noted Plaintiff's weakness in his legs and difficulty walking in April 2005, for which she had prescribed bilateral crutches,[16] confirmed the diagnosis of moderate ataxia on October

---

in the development of essential tremors. *See* medical encyclopedia entries for familial tremor and essential tremor at Medline Plus.

[15] Romberg's sign is a diagnostic sign of certain nervous system disorders in which the patient's body sways when the feet are placed close together and the eyes are closed. *See* dictionary at Medline Plus. Ataxia, or uncoordinated movement, is an abnormality of muscle control or an inability to finely coordinate voluntary muscle movements, resulting in a jerky, unsteady, to-and-fro motion of the trunk or the limbs. Ataxia may appear as a congenital or hereditary defect, following viral infection, encephalitis, head trauma, and diseases affecting the central nervous system or spinal cord. It may also be indicative of a toxic reaction to drugs, medications, alcohol or environmental toxins. *See* medical encyclopedia at Medline Plus.

[16] Defendant argues Plaintiff has not established that his use of crutches was medically necessary, in part because Plaintiff requested them from Dr. Murphy, rather than her prescribing them, and in part because all objective testing, e.g., MRIs of the lower back and brain and an EMG of his legs, undermined his claim that they were necessary. (Defendant's Brief, Docket No. 12, at 25-26, relying on that part of SSR 96-9p, "Determining Capacity to do Other Work – Implications of a Residual Functional Capacity for Less than a Full Range of Sedentary Work," which pertains to the use of medically required hand-held assistive devices.) The Court has found no evidence in the record that any doctor believed Plaintiff used crutches unnecessarily and several commented on bilateral leg weakness and/or tremor. (*See*, e.g., Tr. 265; 342-343; 442-443; 466-467.) As Plaintiff points out, Defendant's analysis and application of SSR 96-9p may be accurate or relevant, but was not raised by the ALJ in his opinion; indeed, he did

16

26, 2005.  (Tr. 444-445 and 466-467, respectively.)

As the Third Circuit Court of Appeals has held, an impairment, once established, must be considered "severe" unless the evidence demonstrates that it is merely a "slight abnormality," having "no more than a minimal effect on an individual's ability to work." Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546-547 (3d Cir. 2003), *quoting* Social Security Ruling ("SSR") 85-28, "Medical Impairments That are Not Severe."[17]  At step two, when identifying Plaintiff's impairments, the ALJ failed to mention his occipital neuralgia, myofascial pain syndrome, or ataxia (Tr. 18) and made only passing reference to the fact that Plaintiff's tremor had "improved" with medication and to Mrs. Forsythe's testimony that he had been treated for fibromyalgia (Tr. 19.)  Although the ALJ listed the exhibits where these impairments and their effects are

_____

not address Plaintiff's use of crutches at all, even though it was discussed at the hearing.  (Tr. 552-553.)  "[T]he grounds upon which an administrative order must be judged are those upon which the record disclosed that its action was based."  SEC v. Chenery Corp., 318 U.S. 80, 87 (1943); *see also* Fargnoli v. Halter, 247 F.3d 34, 43-44 and n.7 (3d Cir. 2001), and Cefalu v. Barnhart, 387 F. Supp.2d 486, 491 (W.D. Pa. 2005) (Hardiman, J.) ("the district court considers and reviews only those findings upon which the ALJ based the decision, and cannot rectify errors, omissions or gaps therein by supplying additional findings from its own independent analysis of portions of the record which were not mentioned or discussed by the ALJ.")

[17]  "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'"  Sykes, 228 F.3d at 271, *citing* 20 C.F.R. § 402.35(b)(1); Williams v. Barnhart, No. 05-5491, 2006 U.S. App. LEXIS 30785, * 8 (3d Cir. Dec. 13, 2006). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same."  Sykes, id., *quoting* Heckler v. Edwards, 465 U.S. 870, 873 n3 (1984).

17

documented, the Court finds his cursory treatment of some 230 pages of medical evidence to be beyond meaningful review and casts doubt on his conclusion that Plaintiff's only severe impairment was degenerative disc disease in his lumbar spine. This is particularly true in light of the policy that reasonable doubts on severity should be resolved in favor of the claimant. Newell, id.

We conclude this case must be remanded for reconsideration of all the medical evidence, beginning at step two. Moreover, even if the ALJ concludes that one or more of Plaintiff's medically determined impairments are not severe, the regulations require that the analysis at step three must address the combined effect of all impairments, "without regard to whether any such impairment, if considered separately, would be of sufficient severity" to award benefits. 20 C.F.R. § 404.1523; see also Plummer v. Apfel, 186 F.3d 422, 435 (3d Cir. 1999) ("the Commissioner shall consider the combined effect of all of Plummer's impairments, physical and mental, in determining whether the claimant is entitled to disability benefits.")

2. *Step four of the analysis - determination of Plaintiff's RFC:* Setting aside for the moment the questions of whether Plaintiff's neuralgia, myofascial pain, tremor, ataxia and/or fibromyalgia were severe impairments or whether any of those impairments, taken in combination with each other or with his degenerative disc disease, met or medically equaled a listed

impairment, we find the ALJ also erred at step four by failing to consider much of the medical evidence together with Plaintiff's subjective complaints in determining his RFC.

Briefly stated, residual functional capacity is the most a claimant can do despite his recognized limitations, taking into account the combined impact of the impairments. 20 C.F.R. § 404.1523; Parker v. Barnhart, 244 F. Supp.2d 360, 369 (D. Del. 2003). Social Security Ruling 96-9p, "Implications of a Residual Functional Capacity for Less than a Full Range of Sedentary Work," further defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule." The regulations require that when evaluating a claimant's residual functional capacity, an ALJ must consider his subjective symptoms insofar as these symptoms "can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529, 416.929(a). Furthermore, the ALJ must consider medical opinions from acceptable medical sources[18] which address the

---

[18] Social Security regulations identify three general categories of medical sources - treating, non-treating, and non-examining. Physicians, psychologists and other acceptable medical sources who have provided the claimant with medical treatment or evaluation and who have had an "ongoing treatment relationship" with him are considered treating sources. A non-treating source is one who has examined the claimant but does not have an ongoing treatment relationship with him, e.g., a one-time consultative examiner. Finally, non-examining sources, including state agency medical consultants, are those whose assessments are premised solely on a review of medical records. 20 C.F.R. § 416.902.

19

nature and severity of the impairments and resulting limitations, observations of lay witnesses and claimant's own statements of what he can or cannot do. 20 C.F.R. §§ 404.1527, 416.927; *see also* SSR 96-5p, "Medical Source Opinions on Issues Reserved to the Commissioner."

"Although the overall RFC assessment is an administrative finding on an issue reserved to the Commissioner, the adjudicator must nevertheless adopt in that assessment any treating source medical opinion (i.e., opinion on the nature and severity of the individual's impairment(s)) to which the adjudicator has given controlling weight under the rules in 20 CFR 404.1527(d)(2) and 416.927(d)(2)." SSR 96-5p. "[A]n RFC assessment must be based upon a consideration of all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." Bush v. Barnhart, 279 F. Supp.2d 512, 518 (D. Del. 2003), *citing* 20 C.F.R. §§ 404.1529, 416.929 and SSR 96-7p.

The ALJ's primary error at step four was failing to discuss most of the relevant medical evidence, much less explain what weight he gave any of that evidence, particularly medical opinions on the severity of Mr. Forsythe's impairments. Briefly summarized, his medical records - other than those pertaining to degenerative disc disease - consisted of reports from:

- Seven visits to the Lee Regional Hospital emergency room for the period October 28, 2002 through July 11, 2004,

20

during which he complained of pain, numbness and/or tingling in his left arm and left leg; continuous headaches; severe headache, nausea, vomiting; chronic neck pain exacerbated by motion and work activities; and severe reactions to medications. (Tr. 182-185; 248-250; 245-246; 238; 289-291; 276-278; 271.)

- Eighteen appointments with Dr. Ernstoff from November 14, 2002, through September 29, 2005, during which he complained of neck pain, headaches and discomfort in both legs. (Tr. 204-207; 273; 202; 267; 200-201; 357-358; 253-265; 459-462.)

- Physical therapy sessions at Crichton Rehabilitation Center in March 2003, August 2004, and October-November 2004, including aquatic physical therapy, use of a TENS unit,[19] and training in an independent home exercise program, none of which provided long-term relief. Although there is no evidence Plaintiff was non-compliant with the rehabilitation plan (except for two missed appointments in March 2003), the therapists noted that "treatment goals were not met secondary to severity of dysfunction," and that there had been "no subjective/ objective functional improvement in patient status in a minimum of 4 weeks of therapy." (Tr. 217-218; 375-378; 387-402.)

- Treatment by pain specialists Drs. Nassr and Hong from June 4, 2003, through August 16, 2005 (15 appointments), during which time he received trigger point injections with no significant improvement, massages, TENS treatments, non-steroidal injections, occipital nerve blocks (which relieved his headaches for two weeks), right occipital cryoablation (which was not helpful), numerous medications, and treatment with an RS-41 garment.[20] (Tr. 437; 310-311; 316; 309; 302-307; 434;

---

[19] A "TENS unit," or transcutaneous electrical nerve stimulator, is a device which sends electrical impulses to designated parts of the body to block pain signals. *See* entry at en.wikipedia.org (last visited September 9, 2008.)

[20] An RS-4i garment is an adjustable vest which allows the user to position stimulator pads on the neck and upper back without help. The pads are connected to a device which not only provides electrical current to interfere with pain stimuli like a TENS unit, but also applies muscle stimulation to contract muscles and restore their function. *See* www.rsmedical.com/product_rs4i (last visited September

299-300; 294-296; 425-426; 419-423.)

- Twenty examinations between June 24, 2003, and October 26, 2005, by Dr. Murphy at the Family Medical Center for pain in both legs and left arm, tremor, chronic neck pain, and fibromyalgia. (Tr. 321-343; 365-366; 453-457; 364; 449-451; 444-445; 441-443; 466-467.)

We recognize that an ALJ is not obligated to discuss every item of evidence, particularly in an extensive medical record. Fargnoli v. Halter, 247 F.3d 34, 42 (3d Cir. 2001). On the other hand, Drs. Ernstoff, Hong, and Murphy must all be recognized as long-term treating medical providers whose opinions regarding the extent and effects of Mr. Forsythe's impairments must be given considerable, if not controlling weight.[21] See 20 C.F.R. §§ 416.927

_____

9, 2008.) Mr. Forsythe was not able to continue using the RS-4i garment because it was not covered by his insurance. (Tr. 425-426.)

[21] Social Security regulations carefully set out the manner in which opinions from the various medical sources will be evaluated. 20 C.F.R. § 416.927. In general, every medical opinion received is considered. Unless a treating physician's opinion is given "controlling weight," the ALJ will consider (1) the examining relationship (more weight given to the opinion of an examining source than to the opinion of a non-examining source); (2) the treatment relationship (more weight given to opinions of treating sources); (3) the length of the treatment relationship and the frequency of examination (more weight given to the opinion of a treating source who has treated the claimant for a long time on a frequent basis); and (4) the nature and extent of the treatment relationship (more weight given to the opinions of specialist than to generalist treating sources.) 20 C.F.R. § 416.927; see also Adorno v. Shalala, 40 F.3d 43, 47-48 (3d Cir. 1994) ("greater weight should be given to the findings of a treating physician than to a physician who has examined the claimant as a consultant" and the least weight given to opinions of non-examining physicians.) The opinions of a treating source are given controlling weight on questions of the nature and severity of the claimant's impairment(s) when the conclusions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. §§ 416.927(c)and 404.1527(d)(2).

22

and 404.1527. However, the ALJ did not mention the opinions of those doctors except to refer to their records by exhibit number. A review of the entire medical record reveals no evidence that any of Plaintiff's doctors believed he was malingering or exaggerating his subjective symptoms.[22] The same review could reasonably lead to the conclusion that Plaintiff's physicians believed he was severely limited not only in his ability to work but in his day-to-day activities as well. Yet, those records were addressed only in a perfunctory manner and without reference to any contrary medical evidence of equal weight on which the ALJ relied for his conclusion that Plaintiff could perform the full range of light work.[23]

We conclude that remand is necessary for further explanation by the ALJ of the evidence on which he relied - and that which he

---

[22] One possible exception to this blanket statement is a note by Dr. Hill on April 6, 2003, in which he noted that "Mr. Forsythe apparently doesn't want to work with a rehabilitation program as his clinical examination looks quite good. I think that he probably only needs more time and he should do quite well. I believe that is particularly [true] if he wants to do well." (Tr. 231.) To the extent this implies that Dr. Hill doubted Mr. Forsythe's motivation to pursue a plan of physical therapy or that he was otherwise motivated to be considered disabled, we believe such implications are refuted by the subsequent medical record which reflects ongoing treatment and therapy for more than two years following this statement.

[23] The ALJ did refer to the reports of two state agency disability examiners dating from May 2003 and January 2004, but properly gave them relatively little weight because they were file reviews as compared to physical examinations and were conducted before much of the medical evidence was compiled. (Tr. 19-20.) Although he noted one report which suggested Plaintiff could perform medium-level work activity, he failed to note that the same examiner concluded Mr. Forsythe had postural limitations, i.e., he could only occasionally climb, balance, stoop, kneel, crouch, or crawl due to problems with his neck. (Tr. 155.)

23

rejected – in determining Plaintiff's RFC. Again, as noted above, Plaintiff's subjective complaints,[24] Mrs. Forsythe's testimony about her husband's limitations, the limitations discussed by Plaintiff's physicians, including those resulting from impairments which the ALJ determines are not severe, must be incorporated at this stage of his analysis.

3. *Application of the Grids:* Finally, we conclude that the ALJ erred by not proceeding to the fifth step of the analysis, but instead relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 ("the Grids.") That is, based on Mr. Forsythe's age at the time of his alleged disability onset, his education, work experience, and the ability to perform the full range of light work, the ALJ found, according to the Grids – specifically Rule 202.21 -- that Plaintiff was not disabled. (Tr. 20-21.)

Social Security regulations describe limitations as "exertional" and "nonexertional." Exertional limitations are those

---

[24] We also conclude the ALJ's credibility analysis is inadequate inasmuch as he does not discuss – other than by brief citation to SSR 96-7p – the analysis to be performed when allegations of pain and other subjective symptoms suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone. *See* 20 C.F.R. §§ 404.1529(c) and 416.929(c). SSR 96-7p directs that in those circumstances, in addition to the medical records, the claimant's statements, and information provided by medical sources or other persons regarding the symptoms and how they affect the individual, the ALJ must consider seven specific factors. Here, the ALJ discussed only two – Plaintiff's activities of daily living and some of the effects of his medications. Because Plaintiff does not make this argument, however, we do not discuss this portion of the ALJ's analysis in detail.

24

which affect an individual's ability to meet the strength demands of a job, e.g., sitting, standing, walking, lifting, carrying, pushing, and pulling. 20 C.F.R. § 416.969a(b). Nonexertional limitations are those which affect the ability to meet the demands of a job not related to strength, e.g., mental conditions such as anxiety or depression; difficulty maintaining concentration or remembering detailed instructions; difficulty seeing, hearing or using other senses in the job environment; environmental conditions such as exposure to dust, fumes, or extremes of cold or heat; or postural limitations such as the ability to reach, handle, stoop, climb, crawl or crouch. 20 C.F.R. § 416.969a(c). Both exertional and nonexertional limitations must be "medically determinable." SSR 85-15, "The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments."

The nature of the claimant's limitations - not his diagnosed impairments or symptoms - determines whether the limitations are considered exertional or nonexertional. For example, pain is considered an exertional limitation when it affects strength demands such as walking, but nonexertional when it affects one's ability to concentrate. *See* SSRs 96-9p and 96-8p, "Assessing Residual Functional Capacity in Initial Claims."

Where the claimant's impairments and related symptoms such as pain fall only within the nonexertional category and his specific vocational profile (i.e., RFC, age, education, skills, etc.)

matches one of the combinations set out in the Grids, the ALJ may directly apply the related rule because the Social Security Administration has concluded that numerous jobs exist (or do not exist) in the national economy which an individual demonstrating that particular combination can perform despite his impairments. 20 C.F.R. § 416.969a(c). However, when the evidence shows both severe exertional and nonexertional limitations, the Grids may not be automatically used to establish that there are jobs the claimant can perform. *See* Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 94 (3d Cir. 2007), confirming that Sykes, 228 F.3d at 261, "squarely rejected" the argument that the Grids can be relied on even when nonexertional limitations exist as long the limitation "does not significantly diminish the range of work that could otherwise be exertionally possible."

The medical evidence here established Plaintiff's subjective complaints of pain and side effects from medication, all of which were acknowledged by the ALJ in his opinion. *See*, e.g., discussion of pain at Tr. 19, daily headaches at Tr. 20, and references to memory problems, dizziness, blurred vision and fatigue at Tr. 19. The medical evidence also establishes the existence of ataxia, bilateral tremor in Plaintiff's hands and legs, numbness in his hands, and bilateral use of crutches, any of which could affect use of his hands or his ability to stand, even if he had the necessary physical strength. Given this evidence, the ALJ could only have

26

applied the Grids properly if he concluded (a) these conditions were only exertional limitations or (b) these conditions did not create any limitations at all. Since this portion of the opinion consists only of stating the relevant law and the conclusory statement that according to Rule 202.21 jobs exist in the national economy that Mr. Forsythe could perform (Tr. 20-21), we are unable to determine the ALJ's reasoning and must remand for further clarification.

## V. FURTHER PROCEEDINGS

Under 42 U.S.C. § 405(g), a district court may, at its discretion, affirm, modify or reverse the Secretary's final decision with or without remand for additional hearings. However, the reviewing court may award benefits "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits." Krizon v. Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), quoting Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir. 1984).

As explained above, we have found the ALJ's analysis beyond meaningful review in several regards, but we are not persuaded that the record - particularly in the absence of any evidence provided by a vocational expert - indicates total disability and an entitlement to benefits. We therefore decline to award benefits and will remand for further consideration consistent with the

27

reasoning herein.

An appropriate Order follows.

September __/8__, 2008        _William L. Standish_
                             William L. Standish
                             United States District Judge